LUCERO, Circuit Judge.
This case requires us to address the extent to which a familial connection to a suspect supports either probable cause for a search warrant or reasonable suspicion for an investigative detention. Following the murder of Bernalillo County Sheriffs Deputy James MeGrane, Lieutenant Gregg Marcantel and Detective Timothy Hix obtained a warrant and ordered the search of property belonging to Rick and Cindy Poolaw, the parents-in-law of the primary suspect, Michael Paul Astorga. Marcantel later ordered the stop of Chara Poolaw, Astorga’s sister-in-law. The search and stop were based on little more than the Poolaws’ status as Astorga’s in-laws.
Although we are sympathetic to the urgency of the officers’ search for Astorga, we conclude that these actions violated the Fourth Amendment. Adhering to established Supreme Court precedent and the unanimous case law of this and other courts, we hold that a familial relationship is insufficiently particularized to justify invading an individual’s reasonable expectation of privacy. Applying this rule to the present case, we conclude that the Poo-laws’ status as Astorga’s in-laws, combined with the meager additional facts known to Marcantel and Hix, were insufficient to support a finding of either probable cause to search the property or reasonable suspicion to detain Chara.[1] Further, because these Fourth Amendment principles were clearly established at the time of their actions, Marcantel and Hix are not entitled to qualified immunity. We have jurisdiction under 28 U.S.C. § 1291, Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), and we affirm.
I
A
In the early hours of March 22, 2006, Bernalillo County Sheriffs Deputy James MeGrane was shot and killed while conducting a traffic stop. Bernalillo County Sheriffs Office (“BCSO”) investigators determined that the truck Deputy MeGrane had stopped belonged to Astorga, who was *726 also wanted in connection with the November 2005 homicide of Candido Martinez. Based on this information, the investigators identified Astorga as the primary suspect in the McGrane homicide, and a manhunt ensued.
BCSO investigators discovered that Astorga had been in the area of the McGrane homicide on the night in question and that he lived at # 31 Lark Road, approximately fifteen miles south of where McGrane was killed. Neighbors of #31 Lark Road told investigators that a man matching Astorga’s description had recently moved in with his “pregnant girlfriend.” Upon canvassing the area, officers also found the vehicle Deputy McGrane had stopped the night he was killed parked in the vicinity of Astorga’s address.
Investigators then sought out Marcella because Astorga had listed her as his spouse and emergency contact when he had been arrested in the past. After detectives failed to locate Marcella at her known address, Lieutenant Marcantel telephoned Rick, a retired New Mexico State Police officer and acquaintance. Rick confirmed that Marcella was his daughter and that she was pregnant by Astorga. He also told Marcantel that she had spent the night of March 21 at Rick and Cindy’s home. Throughout the day, Rick called Marcantel to tell him that Marcella was no longer at the house, that she had uncharacteristically called in sick to work, and, then, that he had ultimately located her.
At the time of the investigation, Rick lived at 343 Calle Del Banco with Cindy and their daughter Chara.[2] Two days after the McGrane homicide, Astorga remained at large. BCSO investigators, including Marcantel and Hix, decided that the Poolaws’ property should be searched. Hix prepared an affidavit seeking a warrant to search the Poolaws’ property (“the Hix affidavit”), in which he provided a general description of the McGrane homicide and investigation. In the affidavit, Hix gave specific information explaining why Astorga was identified as the suspect. He then asserted a connection between Astorga and the Poolaws’ property:
On previous arrests, Michael Paul Astorga listed Marcella Astorga as his spouse and emergency contact. Police detectives have had contact with Ms. Marcella Astorga, and know her as Marcella Poo-law, and that she is currently pregnant BCSO Lieutenant G. Marcantel recognized the name Poolaw and contacted Rick Poolaw at approximately 0830 hours and confirmed he had a daughter named Marcella Poolaw and she was pregnant by Michael Paul Astorga. Rick advised Lieutenant Marcantel that when he left home (343 Calle Del Banco, described above to be searched) that morning, Marcella had got up and was getting ready for work (indicating that she resides there at least part time). Rick Poolaw told Lieutenant Marcantel he would attempt to locate his daughter. Rick later contacted Lieutenant Marcantel and advised him that he had contacted Marcella’s place of employment, and was told she had called in sick. Rick stated that Marcella had not indicated to him that she was sick and that it was very unusual for her not to show up for work. Rick stated that he would continue to attempt to locate Marcella. Based on the apparent fact that Marcella Poo-law (Astorga) resides at least part time at 343 Calle Del Banco (described above *727 to be searched) it would be reasonable to assume that her husband, Michael Astorga, resides there at least part time as well and may have left or hidden evidence related to this crime at this residence. It is also reasonable to assume that, because the entire property is owned by Michael Astorga’s in-laws, that he may have secreted himself or any evidence within any of the structures on the property.
In addition, the affidavit included the facts that Astorga was recently seen by neighbors moving in at # 31 Lark Road with his “girlfriend” and that “[d]etectives attempted to contact [Marcella] at her residence located at 9820 Edith NW, but she was not there.” A New Mexico state court judge issued a warrant on the afternoon of March 24.
That same evening, BCSO officers — but not Marcantel or Hix — executed the warrant on the Poolaws’ property under the supervision of then-Sergeant Scott Baird. During the search, Rick and Cindy were handcuffed outside their home.
A few days later, Marcantel learned that Chara had called Cindy and had asked whether she could “get in trouble” for having a gun. Based on “the fact that Chara was a loved one of Michael Paul Astorga’s wife” and “her admission that, she had a gun,” Marcantel ordered her stopped to determine whether the gun was the McGrane homicide weapon. Chara was detained, handcuffed, and held in a squad car while her car was searched. After the gun found in her car was determined not to be the murder weapon, she was released.
B
Alleging that the search and seizures violated the Fourth Amendment, Rick, Cindy, and Chara (“the Poolaws”) brought this § 1983 action in the United States District Court for the District of New Mexico. Named as defendants were Bernalillo County Sheriff Darren White, Lieutenant Marcantel, Detective Hix, and the Bernalillo County Board of Commissioners.[3] First, the Poolaws alleged that the detentions of Rick, Cindy, and Chara constituted unreasonable seizures (“Claim I”). Second, the Poolaws alleged that the defendants had unreasonably searched their property (“Claim II”).[4] In their answer, the defendants raised a number of affirmative defenses, including qualified immunity.
On the undisputed facts, the Poolaws moved for partial summary judgment, arguing that the warrant to search their property lacked probable cause on its face or, in the alternative, omitted material information negating probable cause, and thus the search and incidental seizure of Rick and Cindy violated the Fourth Amendment. In addition, they argued that Marcantel lacked probable cause to order Chara’s detention, and thus, the stop was unconstitutional. Defendants responded and filed their own motion for partial summary judgment based on qualified immunity.
In a single order, the district court granted summary judgment in favor of the Poolaws on Claims I and II, denying Marcantel and Hix qualified immunity. Poolaw v. White, Mem. Op. and Order, No. CIV 06-923, at 13 (D.N.M. Sept. 26, 2007) (“Sept.2007 Order”). Reviewing the Hix *728 affidavit, the district court found that it established only that Marcella was married to Astorga, that she stayed overnight at Rick and Cindy’s home and did not go to work the next day, and that Astorga was on the run. Id. at 7. Regarding Astorga’s connection to the property, the court concluded that the affidavit “provided only inferences and assumptions of dubious reliability,” which were “simply not enough to provide probable cause to violate the Poo-laws’ right of privacy in their home.” Id. at 8-9. In addition, the court found that Chara’s status as Astorga’s sister-in-law and her conversation with Cindy about a gun did not create reasonable suspicion of criminal activity justifying Chara’s detention. Id. at 12-13. Concluding that these Fourth Amendment principles were clearly established when the incidents occurred, the court denied qualified immunity. Marcantel and Hix now appeal.
II
Orders granting partial summary judgment or denying summary judgment are generally not final appealable orders under 28 U.S.C. § 1291, but we have jurisdiction to review a denial of qualified immunity if the denial turned on a question of law. Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. 737, 744, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976) (a grant of partial summary judgment on liability but not damages is not final); Fogarty v. Gallegos, 523 F.3d 1147, 1153 (10th Cir.2008) (a denial of qualified immunity on summary judgment is appealable to the extent it turns on a question of law). We review the denial of a summary judgment motion raising qualified immunity de novo, Roska ex rel. Roska v. Sneddon, 437 F.3d 964, 971 (10th Cir.2006), applying the same standard as the district court. When a defendant raises an affirmative defense of qualified immunity, the burden rests with the plaintiff to show that the defendant’s actions fall outside the scope of the immunity. See Weigel v. Broad, 544 F.3d 1143, 1151 (10th Cir.2008). In determining whether the plaintiff has made that showing, the district court considers whether the facts taken in the light most favorable to the plaintiff show that the defendant’s conduct violated a constitutional right. Fogarty, 523 F.3d at 1155 (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). If that initial inquiry is satisfied, the court considers whether the right violated was clearly established.[5] Id.

A

Marcantel and Hix contend that the search of the Poolaws’ property was constitutional because it was authorized by a warrant supported by probable cause. Marcantel and Hix argue in the alternative that even if the search violated the Poo-laws’ rights, they cannot be held liable under § 1983 because they were not present when the warrant was executed. We disagree with both contentions.
1
If the Hix affidavit established probable cause for the search, the search of the Poolaws’ property was constitutional. We review the district court’s ruling on the sufficiency of the warrant de novo, but we pay great deference to the probable cause determination made by the judge who issued the warrant. United States v. Perrine, 518 F.3d 1196, 1201 (10th Cir.2008). We will uphold a warrant if the issuing judge had a “substantial basis for *729 ... concluding] that a search would uncover evidence of wrongdoing.” Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quotations omitted); accord United States v. Grimmett, 439 F.3d 1263, 1268 (10th Cir.2006).
“In determining whether probable cause exists to issue a warrant, the issuing judge must decide whether, given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place.” Grimmett, 439 F.3d at 1270 (quotation omitted); see also United States v. Harris, 369 F.3d 1157, 1165 (10th Cir.2004) (“Probable cause exists when the facts presented in the affidavit would warrant a man of reasonable caution to believe that evidence of a crime will be found at the place to be searched.” (quotation omitted)). But, a court may not “arrive at probable cause simply by piling hunch upon hunch.” United States v. Valenzuela, 365 F.3d 892, 897 (10th Cir.2004). We assess the validity of the warrant “on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing [judge],” Maryland v. Garrison, 480 U.S. 79, 85, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987); see Wilkins v. DeReyes, 528 F.3d 790, 802 (10th Cir.2008), looking both at the facts that support probable cause and those that militate against it, Valenzuela, 365 F.3d at 897.
Marcantel and Hix do not contend that facts outside the affidavit, but known to the issuing judge, supported its issuance, thus we confine our review to the Hix affidavit. See Aguilar v. Texas, 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) (“It is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate’s attention.”), overruled on other grounds by Gates, 462 U.S. at 238, 103 S.Ct. 2317.[6] Although it describes the progress of the McGrane homicide investigation, less than a page of the Hix affidavit links the investigation to the Poolaws’ property. The district court characterized the warrant as “issued because [the Poolaws’] daughter was married to Astorga, she stayed overnight at their house and did not go to work the next morning, and Astorga was on the run.” Sept.2007 Order, at 7. As Marcantel and Hix note, the affidavit also mentions that Astorga had listed Marcella as his emergency contact when arrested previously and that she was pregnant by him.[7] Marcantel and Hix claim that the district court erred in concluding that these facts did not provide a substantial basis for the warrant.
We start our analysis with the inarguable proposition that “mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause.” Ybarra v. Illinois, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). In Ybarra, the proximity at issue was physical, but propinquity is specifically defined as nearness in “kindred or parentage.” Black’s Law Dic *730 tionary 1255 (8th ed.2004). In United States v. Vazquez-Pulido, this court accepted the proposition that “mere propinquity” includes sibling relationships when reviewing probable cause to arrest. 155 F.3d 1213, 1216 (10th Cir.1998) (citing Ybarra, 444 U.S. at 91, 100 S.Ct. 338). We see no reason to distinguish between probable cause to arrest, the issue in VazquezPulido, and probable cause to search, the issue here. Our sibling circuits to address the question have held that a search warrant resting primarily on a “familial relation” is “so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.” United States v. Herron, 215 F.3d 812, 814 (8th Cir.2000); see also Walczyk v. Rio, 496 F.3d 139, 162-63 (2d Cir.2007) (a warrant inaccurately implying that the defendant had lived with his mother recently did not establish probable cause to search the mother’s home).
District courts directly addressing whether a familial relationship constitutes probable cause have also uniformly held that it does not. United States v. Fernandez-Morris, 99 F.Supp.2d 1358, 1368 (S.D.Fla.1999) (one’s status as the father of a suspect is insufficient to establish probable cause); Timberlake ex rel. Timberlake v. Benton, 786 F.Supp. 676, 686 (M.D.Tenn.1992) (one’s status as the girlfriend or sister of a suspect is insufficient to establish probable cause); Doe v. City of Chicago, 580 F.Supp. 146, 150-51 (N.D.Ill.1983) (one’s status as the child of a suspect is insufficient to establish probable cause). Based on Ybarra, Vazquez-Pulido, the plain meaning of propinquity, and the unanimity of the case law from other jurisdictions, we discern a clear rule: A familial relationship to someone suspected of criminal activity, without more, does not constitute probable cause to search or arrest.
Therefore, we must consider whether the additional facts linking Astorga to the Poolaws’ property provide the additional particularized information necessary to establish probable cause. From the face of the affidavit, the following additional facts are relevant: (1) Astorga listed Marcella as his spouse and emergency contact during previous arrests; (2) Marcella was pregnant; (3) Marcella spent the night of the McGrane homicide at Rick and Cindy’s home; (4) Marcella called in sick to work the next day, which was unusual for her; (5) Marcella resided with Astorga at # 31 Lark Road; and (6) detectives also had a residence for her listed as 9820 Edith NW.
We agree with the district court that the affidavit fails to establish the “apparent fact” or “reasonable ... assumption]” that either Marcella or Astorga resided “at least part time” with the Poolaws. Rather, these are unsupported conclusions that Hix leapt to knowing only that Marcella had spent a single night there. An overnight stay is not part-time residency. Further, the actual facts in the affidavit militate against either conclusion: Marcella and Astorga lived at a different address, # 31 Lark Road, a fact confirmed by neighbors and Marcella herself, and the only alternative residence known to BCSO detectives was 9820 Edith NW. Certainly, a single night indicated a possibility that Marcella lived at her parents’ part time, but a possibility is not the probability that the Fourth Amendment requires. Grimmett, 439 F.3d at 1270.
Further, the connection between the Poolaws’ property and Astorga-the actual suspect and the would-be source of evidence of criminal activity-is even more attenuated. It relies on the assumption that if Marcella had contact with the property, so too did Astorga. The affidavit establishes a close familial connection between Astorga and Marcella, and it connects *731 Marcella to the property because she stayed there the night of the McGrane homicide. But linking Marcella to the property is not equivalent to linking the McGrane homicide to the property; to find probable cause, it is the latter connection that must be established. See United States v. Gonzales, 399 F.3d 1225, 1231 (10th Cir.2005). Further circumstances described in the affidavit-that Marcella had uncharacteristically called in sick to work-do not rise to a fair probability that such a connection exists, particularly in light of the fact that Astorga and Marcella resided elsewhere. See Harris, 369 F.3d at 1165.
No fact in the Hix affidavit suggests that Marcella had any contact with Astorga or that Astorga had any contact with the Poolaws’ property during which time Astorga could have hidden evidence of the McGrane homicide.[8] Rather, following its description of Marcella’s connection to the property, the Hix affidavit enters into pure speculation:
Based on the apparent fact that Marcella Poolaw (Astorga) resides at least part time at 343 Calle Del Banco ... it would be reasonable to assume that her husband, Michael Astorga, resides there at least part time as well and may have left or hidden evidence related to this crime at this residence. It is also reasonable to assume that, because the entire property is owned by Michael Astorga’s in-laws, that he may have secreted himself or any evidence within any of the structures on the property (emphases added).
Thus, the ultimate conclusion that Astorga or evidence of the McGrane homicide would be found at the Poolaws’ property was based on a mere hunch that Astorga lived there, piled upon the hunch that Marcella lived at the property.[9] See Valenzuela, 365 F.3d at 897; see also Gonzales, 399 F.3d at 1229-30 (an officer cannot reasonably rely upon a warrant containing “no facts explaining how the address was linked to [the defendant] ... or the suspected criminal activity, or why the officer thought the items to be seized would be located at the residence”).
Nonetheless, Marcantel and Hix argue that “[l]aw enforcement officers know and are trained that fugitives like Astorga will run to their family and friends,” and that this experience is sufficient to establish a substantial nexus between Astorga and the Poolaws’ property. Appellant’s Br. at 14. Marcantel and Hix claim that our precedent does not require law enforcement officers to obtain direct evidence or possess personal knowledge that evidence or contraband is located on *732 property to be searched; rather, they contend that officers can rely on training and experience to establish the required nexus. They cite United States v. $149,442.43 in U.S. Currency for the proposition that “[c]ourts often rely on the opinion of police officers as to where contraband may be kept.” 965 F.2d 868, 874 (10th Cir.1992) (citations omitted). But unlike the affidavit at issue in $149,442.43 in U.S. Currency, the Hix affidavit does not mention any training or experience regarding where fugitives hide.[10] Even if Hix had included such training in the affidavit, an officer’s expertise cannot be invoked to nullify the Supreme Court’s holding that mere propinquity is insufficient to establish probable cause. Ybarra, 444 U.S. at 91, 100 S.Ct. 338. Considering the totality of the circumstances and the lack of specific information linking Astorga to the Poolaws’ property, we conclude that there was not probable cause to issue the search warrant. See Grimmett, 439 F.3d at 1270.
Because there was no probable cause to issue the warrant, the search of the Poolaws’ property violated their Fourth Amendment rights. Moreover, because the “search [wa]s illegal and not supported by probable cause, the justification for using the search as the foundation for the seizure disappears because it was the connection of the individual with a location suspected of harboring criminal activity that provided the reasonable basis for the seizure.” Jacobs v. City of Chicago, 215 F.3d 758, 772 (7th Cir.2000) (citation omitted); see also Michigan v. Summers, 452 U.S. 692, 703, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (“[A] detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant.” (emphasis added)). Because Marcantel and Hix do not assert independent cause or suspicion for the detention of Rick and Cindy while their property was searched, this seizure also violated their constitutional rights. Jacobs, 215 F.3d at 772.
2
We next consider Marcantel and Hix’s assertion that even if the search and seizure violated the Poolaws’ Fourth Amendment rights, they cannot be liable under § 1983 because they were not present during its execution. While a supervisory relationship alone is insufficient for liability under § 1983, Duffield v. Jackson, 545 F.3d 1234, 1239 (10th Cir.2008), an officer need not execute a search personally to be liable. See Snell v. Tunnell, 920 F.2d 673, 700-01 (10th Cir.1990). Rather, a defendant may be liable if a plaintiff can show that an “affirmative link exists between the [constitutional] deprivation and either the [officer’s] personal participation, his exercise of control or direction, or his failure to supervise.” Green v. Branson, 108 F.3d 1296, 1302 (10th Cir.1997) (quotation omitted). That showing can be made with “deliberate, intentional act[s]” that “caused or contributed to the ... violation.” Jenkins v. Wood, 81 F.3d 988, 994-95 (10th Cir.1996) (quotation omitted).
For liability under section 1983, direct participation is not necessary. Any official who “causes” a- citizen to be deprived of her constitutional rights can also be held liable. The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should *733 have known would cause others to deprive the plaintiff of her constitutional rights.
Snell, 920 F.2d at 700 (quoting Conner v. Reinhard, 847 F.2d 384, 396-97 (7th Cir.1988)); see also Buck v. City of Albuquerque, 549 F.3d 1269, 1279-80 (10th Cir.2008).
In order for the plaintiffs to prevail on their claims, therefore, they must show that Marcantel and Hix set in motion a series of events they knew or reasonably should have known would result in the search of the Poolaws’ property and the seizure of Rick and Cindy. Given that Marcantel ordered the search and Hix swore out the affidavit, it strains credulity that they would not have known these clearly intentional acts would lead directly to the search. On the record before us, however, it is far less clear whether they knew or reasonably should have known that these actions would cause the seizure, and the district court gave this question perfunctory analysis. Nonetheless, viewing the record and drawing the reasonable inferences therefrom in the light most favorable to the Poolaws, as we must, Weigel, 544 F.3d at 1151, we conclude that a reasonable jury could find Marcantel and Hix knew or reasonably should have known the Poolaws. would be seized incident to the search. In particular, Sergeant Baird testified in his deposition that it was BCSO standard procedure to handcuff the people present in a home during a search, and there is no evidence in the record that Marcantel and Hix believed an exception .would occur during this particular search. For these reasons, Marcantel and Hix are not entitled to qualified immunity on summary judgment despite not being present when the Poolaws’ Fourth Amendment rights were violated.[11]
B
Because Marcantel and Hix violated the Poolaws’ constitutional rights, we must inquire whether the rights were clearly established such that a reasonable person in the position of Marcantel or Hix would have been aware that the search and seizure were unconstitutional when they occurred. Weigel, 544 F.3d at 1153. Because the defendants assert that they are entitled to qualified immunity on the undisputed facts, this is a question of law. See Keylon v. City of Albuquerque, 535 F.3d 1210, 1217-18 (10th Cir.2008).
Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains. The plaintiff is not required to show, however, that the very act in question previously was held unlawful in order to establish an absence of qualified immunity.
Weigel, 544 F.3d at 1153 (quotations omitted). Our inquiry is whether the contour of the divide is “sufficiently clear that a reasonable official would understand that what he is doing violates that right.” Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quotation omitted).
This court has unambiguously held that probable cause cannot be estab *734 lished, as noted, “simply by piling hunch upon hunch.” Valenzuela, 365 F.3d at 897. As explained above, the only link between the McGrane homicide and the Poolaws’ property was the unjustified conclusion that Marcella lived there at least part time and the follow-on conjecture that Astorga lived there as well. It is clearly established in our Fourth Amendment jurisprudence that probable cause for a warrant requires a fair probability that the evidence sought would be found on the property. Grimmett, 439 F.3d at 1268, 1270. As we held in Gonzales, the necessity of a nexus between the suspected criminal activity and the particular place to be searched is so well established that in the absence of such a connection, “the affidavit and resulting warrant are so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.” 399 F.3d at 1231 (quotation omitted).
Specifically, it is clearly established that mere propinquity is insufficient to establish probable cause. Ybarra, 444 U.S. at 91, 100 S.Ct. 338. That neither the Supreme Court nor the Tenth Circuit has explicitly held that propinquity includes parents-in-law and sisters-in-law is immaterial given the plain meaning of propinquity and the unanimity of courts holding that a familial relationship does not establish probable cause. See York v. City of Las Cruces, 523 F.3d 1205, 1211-12 (10th Cir.2008) (“[T]he clearly established weight of authority from other courts” establishes a right for the purposes of qualified immunity.). Under the clearly established standards for what constitutes probable cause, no reasonable officer could have believed that the meager facts related to the Poolaws’ property described in the Hix affidavit established more than a possibility that evidence of the McGrane homicide would be found there. .The affidavit was “so lacking in indicia of probable cause as to render official belief in its existence unreasonable.” Malley v. Briggs, 475 U.S. 335, 345, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Thus, Marcantel and Hix could not have “reasonably but mistakenly conclude[d] that probable cause [wa]s present,” and they are not entitled to qualified immunity.[12] Cortez v. McCauley, 478 F.3d 1108, 1120 (10th Cir.2007) (en banc).
The dissent presses the point that because Marcantel and Hix sought and obtained a search warrant from a judge, they should be entitled to qualified immunity unless they intentionally, misled the judge. Dissenting Op. at 745-46. This conclusion is misguided for two reasons.
First, it is clearly established that “employ[ing] a reasonable process in seeking the warrant” does not relieve officers of their constitutional duty to “exercise their own professional judgment” as to the existence of probable cause. Gonzales, 399 F.3d at 1230. The very case on which the dissent relies stands for the proposition that the issuance of a warrant by a magistrate does not immunize officers:
It is true that in an ideal system an unreasonable request for a warrant would be harmless, because no judge would approve it. But ours is not an ideal system, and it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should. We find it reasonable to require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment.
*735 Malley, 475 U.S. at 345-46, 106 S.Ct. 1092. Thus, it is not conclusive, as the dissent suggests, that “[a] law trained judge found the affidavit sufficient to establish probable cause and issued the warrant,” Dissenting Op. at 742, as the issuance of the warrant simply does not control the outcome of our inquiry into the officers’ exercise of their own professional judgment. Malley, 475 U.S. at 345-46, 106 S.Ct. 1092.
Second, it is beyond question that an officer’s duty to exercise his independent professional judgment is not met simply because he lacks subjective bad faith. Rather, the inquiry is an objective one: “whether a reasonably well-trained officer in [the defendant’s] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.” Malley, 475 U.S. at 345, 106 S.Ct. 1092; accord Keylon, 535 F.3d at 1218 (“After Harlow [v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ], qualified immunity does not depend on the officer’s subjective, good faith belief that he was not violating clearly established federal law, but instead the defense now hinges on whether that belief was reasonable.”); Bruning v. Pixler, 949 F.2d 352, 356 (10th Cir.1991) (“The subjective component [of qualified immunity] focused on the good faith of the official and relieved him from liability if he did not actually know his conduct was unconstitutional and did not act with malicious intent. Harlow eliminated any consideration of the defendant’s intent as it relates to his knowledge of the law....”). Whether the officers intentionally misled the judge is simply of no moment unless such intent is an element of the plaintiffs’ claims, which it is not here. See Bruning, 949 F.2d at 356; Meyer v. Bd. of County Comm’rs of Harper County, 482 F.3d 1232, 1242 (10th Cir.2007) (“Subjective good faith or bad faith of government actors is ordinarily irrelevant to the objective inquiry whether a reasonable officer would have realized that his conduct was unlawful.”). As we explain above, given the absence of a factual connection other than Marcella between Astorga and the Poolaws’ property, an officer could not reasonably apply for a search warrant believing that probable cause existed.[13]
We thus affirm the district court’s denial of Marcantel and Hix’s motion for summary judgment related to the search of the Poolaws’ property and the resulting detention of Rick and Cindy.[14]
*736 III
‘ Marcantel also asserts that he is entitled to qualified immunity for the detention of Chara because he did not violate her Fourth Amendment right to be free from unreasonable seizures.[15] He acknowledges that he ordered the stop, but asserts that it was based on reasonable suspicion. We disagree: Chara’s status as Astorga’s sister-in-law and her conversation with Cindy about a gun did not establish a reasonable suspicion that she was committing or had committed a crime.
A
Law enforcement officers may “conduct an investigatory stop if they have a ‘reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with’ ” a crime in progress, a completed felony, or perhaps, a completed misdemeanor. United States v. Moran, 503 F.3d 1135, 1141-43 (10th Cir.2007) (quoting United States v. Hensley, 469 U.S. 221, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)). Reasonable suspicion is established if the “totality of the circumstances suffices to form' a particularized and objective basis for a stop.” Id. at 1140 (quotations omitted). “[T]he level of suspicion required for reasonable suspicion is ‘considerably less’ than proof by a preponderance of the evidence or that required for probable cause.... Officers merely need an articulable reasonable suspicion that criminal activity may be afoot-they need not even assert a ‘fair probability’ that their investigation will actually turn up evidence of criminal activity.” United States v. Lopez, 518 F.3d 790, 799 (10th Cir.2008) (citation omitted). However, reasonable suspicion may not be based on a mere hunch or conjecture. See United States v. Karam, 496 F.3d 1157, 1162 (10th Cir.2007); United States v. Caro, 248 F.3d 1240, 1246 (10th Cir.2001).
Marcantel argues that he had reasonable suspicion to believe that Chara had the McGrane homicide weapon in her car when he ordered the stop. He relies on three facts for this conclusion: (1) Chara told her mother she was anxious about having a gun in her car, (2) Chara was Astorga’s sister-in-law, and (3) the McGrane homicide weapon had not been found.[16]
Because it is lawful to carry a gun in a vehicle in New Mexico, N.M. Stat. § 30-7-2(A)(2); United States v. King, 990 F.2d 1552, 1563 n. 5 (10th Cir.1993); State v. Gutierrez, 136 N.M. 18, 94 P.3d 18, 22 (N.M.Ct.App.2004), Chara’s admission that she had a gun does not weigh heavily in our reasonable suspicion calculus — particularly in light of the fact that Marcantel knew the Poolaws legally owned firearms. We next weigh Chara’s anxiety during the *737 phone call, but in light of the fact that her home had just been searched by a team of law enforcement, we consider such anxiety to be akin to nervousness during a police encounter. “ ‘We have repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government’s repetitive reliance on ... nervousness ... as a basis for reasonable suspicion ... must be treated with caution.’” United States v. Wood, 106 F.3d 942, 948 (10th Cir.1997) (quoting United States v. Fernandez, 18 F.3d 874, 879 (10th Cir.1994)) (alterations original). Given the paucity of additional information on which Marcantel based his decision, this case is quite unlike those in which this court has identified significant additional factors supporting the connection between nervousness and reasonable suspicion. See, e.g., United States v. AlcarazArellano, 441 F.3d 1252, 1260 (10th Cir.2006) (defendant had implausible travel plans and suspiciously purchased a used vehicle); United States v. Bradford, 423 F.3d 1149, 1157-58 (10th Cir.2005) (“[Defendant’s] answers to basic questions were evasive and conflicting at best, .and the story she told defied common sense, particularly the financial illogic of purchasing a series of one-way plane tickets and one-way car-rentals.”); see also United States v. Santos, 403 F.3d 1120, 1127 (10th Cir.2005) (“[N]ervousness is a sufficiently common-indeed natural-reaction to confrontation with the police that unless it is unusually severe or persistent, or accompanied by other, more probative, grounds for reasonable suspicion, it is of limited significance in determining whether reasonable suspicion exists.” (quotations and citations omitted)). Thus, on the facts of this case, we give little weight to Ohara’s anxiety.
Because we examine the totality of the circumstances, we add the final relevant fact to our calculus.: Chara was Astorga’s sister-in-law. As above, we consider that “ ‘a person’s mere propinquity to others independently suspected of criminal activity,’ create[s] neither probable cause nor reasonable suspicion.” United States v. Tehrani, 49 F.3d 54, 59 (2d Cir.1995) (quoting Ybarra, 444 U.S. at 91, 100 S.Ct. 338). Ybarra itself rejected the argument that propinquity alone was sufficient to justify an investigative detention. 444 U.S. at 91-93, 100 S.Ct. 338. Thus, our holding above applies equally to the stop of Chara: Without more, a familial connection to a suspect does not establish reasonable suspicion.
Marcantel does not argue that he knew of anything beyond mere propinquity connecting Chara and Astorga. Because the status of an individual, rather than her behavior, cannot be particularized to a specific accusation, we are wary of giving it much weight. See United States v. Freeman, 479 F.3d 743, 749 (10th Cir.2007). In Freeman, we held that the defendant’s parolee status and criminal history, even when combined with his agitation and his girlfriend’s sudden movement, did not create reasonable suspicion without other particularized objective facts. Id. Chara’s status as Astorga’s sister-in-law, when combined with nothing more than her possession of a firearm and her anxiety, similarly fails to establish reasonable suspicion. Thus, because Marcantel did not reasonably suspect that Chara was involved in the McGrane homicide, he violated her Fourth Amendment right to be free from unreasonable seizures by ordering the stop.[17]
*738 B
Marcantel does not challenge whether the law regarding Chara’s stop is clearly established, but we consider it because it is a question of law on which the plaintiffs bear the burden of proof. See Weigel, 544 F.3d at 1151. That “mere propinquity” does not create reasonable suspicion is clearly established, and its contours encompass familial relationships. See supra Part II.B. Further, it is clearly established that nervous behavior is of minimal significance in determining reasonable suspicion. Wood, 106 F.3d at 948. Thus, Chara’s stop violated her clearly established Fourth Amendment rights. For that reason, we affirm the district court’s denial of Marcantel’s motion for summary judgment based on qualified immunity with respect to the detention of Chara.
IV
AFFIRMED.

. Because many of the individuals involved in this case share the name Poolaw, we will refer to Rick, Cindy, Chara, and Marcella by their first names. In the record, Marcella is also referred to as Marcella Poolaw Astorga, Marcella Astorga, Marcella Poolaw, Nicole, Nicki, and Nikki.

. In their complaint, the Poolaws noted that at the time of the search Chara lived at a separate address behind Rick and Cindy's home. However, because they do not press a claim dependent upon this fact, we will not consider the search of Chara’s home separately-

. In their response to the defendants’ partial motion for summary judgment, the Poolaws agreed to dismiss the claims against Sheriff White and the Bernalillo County Board of Commissioners.

. Initially, the Poolaws also raised state tort claims and claims of excessive force and supervisory liability, none of which are at issue in this appeal.

. The Supreme Court made this "order of battle” discretionary in Pearson v. Callahan, - U.S. -, -, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009). Because we conclude that both inquiries are necessary to our analysis, we adhere to Saucier's structure.

. Before the district court, the Poolaws argued that Marcantel and Hix had knowingly or recklessly omitted information vitiating probable cause. Sept.2007 Order, at 2; see Wolford v. Lasater, 78 F.3d 484, 489 (10th Cir.1996). But the district court concluded that the warrant was invalid regardless of this information, and the Poolaws do not advance this argument on appeal. Because we conclude that the facts in the Hix affidavit do not support probable cause, we too need not consider it.

. Marcantel and Hix also urge on appeal that they "knew that after Marcella received a phone call at the Plaintiffs’ residence on the morning McGrane was murdered, she disappeared for hours.” Appellant’s Br. at 14. Because this phone call is not mentioned in the affidavit, it does not affect our analysis.

. The defendants argue that reviewing Astorga’s contact with the property starting from the time of the McGrane homicide ignores the possibility that evidence of the Martinez homicide, which occurred several months earlier, would be found on the property. However, having rejected the unfounded assumption that Marcella or Astorga "resided at least part time" at the Poolaws', we see no factual basis in the affidavit connecting Astorga to the Poolaws’ property prior to the McGrane homicide. To the contrary, the only time period to which the affidavit refers is "03/21/06 and 03/22/06 [until] the present time.”

. The dissent agrees that we must ignore the unsupported conclusions asserted in the affidavit. Dissenting Op. at 745. However, in concluding that probable cause exists, the dissent relies on similar assumptions: that Astorga would seek out his family, that Marcella stayed with her parents "at least occasionally,” that she "may well have had contact with Astorga,” and that “[i]f she had contact with Astorga[,] ... evidence might be available on the Poolaw property.” Id. at 739-41 (emphasis added). As with the affidavit, this chain of "inferences,” id. at 738-39, does not establish the requisite factual connection between Astorga and the Poolaws’ property. See Valenzuela, 365 F.3d at 897.

. The Hix affidavit states only that Hix has experience and training in homicides generally. For an officer’s experience and training to support a finding of probable cause, the affidavit must set out facts explaining why, based on this experience and training, there was reason to believe the contraband is more likely to be found at the particular location. United States v. Rowland, 145 F.3d 1194, 1205 n. 5 (10th Cir.1998).

. We note that in this interlocutory appeal, the court has jurisdiction solely to review the issues of law raised by the denial of qualified immunity to Marcantel and Hix. Mitchell, 472 U.S. at 530, 105 S.Ct. 2806. We acknowledge that because the district court granted partial summary judgment to the plaintiffs on this claim, it will proceed to trial solely on the question of damages following this decision. However, qualified immunity is immunity to suit, not a defense to liability. Id. at 526, 105 S.Ct. 2806. This distinction is apt in a case such as this: Marcantel and Hix can challenge both liability and damages in a single appeal after trial. Thus, we do not pass on whether there is a disputed issue of material fact or on the merits of whether the defendants are liable for these constitutional violations.

. In a petition for rehearing, appellants argue that "[t]he majority’s failure to apply the Leon 'good faith' exception to this case, and its refusal to grant immunity to the Defendants on that basis, leaves open an important question." Appellants fail to note that they neither raised this potentially meritorious issue at the trial court level nor did they brief or argue it to this panel. Because of this failure, we do not consider the issue. See Oliveros v. Mitchell, 449 F.3d 1091, 1095 (10th Cir.2006) (issues not raised before the district court are waived); Becker v. Kroll, 494 F.3d 904, 913 n.6 (10th Cir.2007) (issues not raised in opening appellate brief are waived).

. The dissent also argues that although mere propinquity, without more, does not give rise to probable cause, Ybarra, 444 U.S. at 91, 100 S.Ct. 338, "[t]here is no clearly established law explicitly saying how an officer seeking to obtain a warrant is supposed to know how much 'more' than a familial relationship is required.” Dissenting Op. at 746. The dissent further states that our decision “admits” that there is "more in this case” and "demand[s] a lot more.” Id. But the dissent misapprehends our analysis. Although there are facts in the affidavit other than the Poo-laws’ familial relationship, none of these additional facts makes the necessary connection between Astorga and the Poolaws’ property or Marcella and the McGrane homicide. It is this complete absence of facts beyond mere propinquity connecting the suspect to the property that leads us to conclude that Marcantel and Hix could not reasonably believe that there was probable cause to search the Poolaws’ property.

. It is clearly established that temporarily seizing a person while a search is conducted is justified only when the search itself is constitutional. See Florida v. Royer, 460 U.S. 491, 499, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); Summers, 452 U.S. at 703, 101 S.Ct. 2587. Thus, because Marcantel and Hix do not allege that they had an independent reason to seize Rick and Cindy, we also affirm the denial of the appellants’ motion for summary judgment on Rick and Cindy’s seizure claim.

. Marcantel argues that he cannot be liable for exceeding the scope of the reasonable suspicion justifying the stop because he was not present when the stop was executed. Because we conclude there was no reasonable suspicion to support Marcantel’s decision to order the stop at its outset, we need not consider whether the stop exceeded the scope of suspicion.

. Marcantel and Hix do not argue that they were suspicious of any criminal activity other than involvement in the McGrane homicide, so that is the only justification for the stop we consider. Although Marcantel explained that he ordered the stop to "find out what gun is she [sic] talking about,” to the extent his goal was to determine that the gun was not the murder weapon and to eliminate Chara as a suspect, that ground cannot justify the detention. Suspicion of criminal activity "must be ... particularized with respect to the person” to be searched or seized, see Ybarra, 444 U.S. at 91, 100 S.Ct. 338, and thus the desire to confirm an individual’s innocence cannot support an intrusion on her Fourth Amendment rights.

. As with the search, Marcantel argues that because he was not present when the stop was executed, he cannot be held liable under § 1983. See Duffield, 545 F.3d at 1239. As before, because Marcantel ordered the stop, he engaged in a "deliberate, intentional act” *738 that directly led to the constitutional violation. Jenkins, 81 F.3d at 995 (quotation omitted). Because Marcantel "caused or contributed to the ... violation,” he can be held liable under § 1983. Id. at 994.