FILED
United States Court of Appeals
Tenth Circuit

April 15, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

CARL ERNESTO ROMERO,

      Defendant - Appellant.

No. 13-2019

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:09-CR-01253-JB-1)**

Edward O. Bustamante, Albuquerque, New Mexico, for Defendant - Appellant.

James R.W. Braun, Assistant United States Attorney, (Steven C. Yarbrough, Acting United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff - Appellee.

Before **HARTZ**,  **BALDOCK**, and **BACHARACH**, Circuit Judges.

**HARTZ**, Circuit Judge.

Defendant Carl Romero was convicted by a jury of assaulting and killing Naayaitch Friday. He challenges the district court's refusal to suppress evidence found after searches of the car he drove and his bedroom. We hold that the search warrant for the car was supported by probable cause and that investigating officers properly relied on his stepfather's consent to search his bedroom. Exercising jurisdiction under 12 U.S.C. § 1291, we affirm the district court's denial of his motions to suppress.

## I.    BACKGROUND

Mr. Friday's body was found in an arroyo off a dirt road on the San Ildefonso Pueblo in New Mexico on April 11, 2009. He had been shot in the chest and the chin. In his pocket was a receipt from a nearby casino sports bar that had been printed shortly before midnight of the night before. Because the scene had no shell casings and almost no blood, investigating agents inferred that he had been shot somewhere else and his body had been moved.

In the course of investigating the murder, FBI Special Agent Arlen Scholl applied for a warrant to search a green Chevrolet Cavalier. The affidavit in support of the warrant explained what Agent Scholl had discovered about Mr. Friday's whereabouts and activities before the murder. We summarize the affidavit. Except where otherwise noted,

2

the affidavit's description of Mr. Friday's activities was based on information from his friend, Fabian Madrid, who was with him the night before his body was discovered.[1]

About 9:30 p.m. on April 10, Mr. Friday had been drinking and socializing with some friends at a Sonic Drive-in. They were joined by three men in a green Chevrolet Cavalier whom they had not met before. Another man arrived and displayed a gun, frightening Mr. Madrid, who ran behind a vehicle. The men in the Cavalier offered to let Mr. Madrid use their gun—a "long 'rifle type' gun" in their car—if he needed it, R., Vol. I at 79–80, but the incident was resolved without violence.

Eventually, Mr. Friday, Mr. Madrid, and the three men in the Cavalier decided to leave the drive-in and meet at a nearby casino. Mr. Friday rode in the Cavalier, while Mr. Madrid got a ride from some female friends. Surveillance video shows that the five men met at the casino and spent about half an hour in its sports bar before leaving together in the Cavalier; it also shows that about an hour later, at 12:35 a.m. on April 11, all five men returned to the casino parking lot. Casino security personnel spoke with them and wrote down the vehicle's license-plate number because they had observed it driving erratically. One of the security officers recognized the driver as a former casino employee but did not remember his name.

---

[1] The affidavit identifies Mr. Madrid only as Mr. Friday's "associate." R., Vol. I at 79. Agent Scholl's testimony at the suppression hearing revealed that the "associate" in the affidavit was Mr. Madrid.

After the men left the Casino, Mr. Madrid was dropped off at a friend's house. He could not remember the exact time he left the car because by then he was "extremely intoxicated." *Id.* at 81. When he left, Mr. Friday had with him about $400 in cash and a full bottle of Crystal Palace Vodka. Mr. Madrid did not see Mr. Friday alive again. His body was found at 4:30 p.m. the next day in an arroyo about two miles from the house where Mr. Madrid had been dropped off. A nearly full bottle of Crystal Palace Vodka was between his legs and $118 was on his person. An autopsy revealed that Mr. Friday had been shot at close range with a shotgun.

The affidavit further described what Agent Scholl had learned about the Cavalier and its driver. The car was registered to Defendant's aunt, at the same address where Defendant lived.[2] Mr. Madrid picked out Defendant from a photo lineup as the driver of the car and said that Defendant and the other two men in the car were members of a gang based in the Espanola, New Mexico, area. Agents confirmed that Defendant had worked as a valet at the casino. According to a tribal-police incident report, Defendant had been arrested earlier in the year for careless driving and driving under the influence; the arresting officer had seized from the car a loaded .410 shotgun, which was later released to Defendant's mother.

The affidavit concluded that "it is probable that the murder either occurred in the green Chevrolet Cavalier or the victim's body was transported to its discovery location in

---

[2] The affidavit refers to the registered owner of the car as Defendant's grandmother, but she was actually his aunt.

the vehicle." *Id.* at 83. It said that based on the affiant's training and experience, the car could have evidence including "firearms, ammunition, clothing, . . . hairs, blood, bodily fluids, tissue and bone fragments, fingerprints, gunpowder, and any other items used in the planning or commission of murder." *Id.* at 84. On April 16, 2009, a magistrate judge issued the requested warrant to search the Cavalier.

Federal agents went to execute the warrant at the address where Defendant and his aunt lived. There were two residences at the address, and the Cavalier was parked between them. The agents knocked on the door to the rear residence. They were intending to conduct a security sweep of the residence to be sure that no one would interfere with their search of the car. Orlando Martinez, who owned the house, answered and told the agents that he was Defendant's stepfather but that Defendant was not inside. He granted permission to the agents to walk through the house.

During their sweep of the residence, the agents opened the door to Defendant's bedroom. Although there was a lock on the door, the lock was not clearly visible, the agents did not see it, and the door was not locked when the agents opened it. The agents found Defendant asleep and observed in the room a .410 shotgun and a red baseball cap, which they considered significant because Mr. Friday had been killed with a small-caliber shotgun and Defendant had been seen wearing a red baseball cap in casino surveillance video. When Defendant woke up, the agents asked if they could talk with him outside. He agreed and, while sitting in the front passenger seat in a car of one of the agents, he was questioned about his activities on April 10 and 11. He confessed to

shooting Mr. Friday and said that the shotgun in his room was the weapon used. He then granted oral and written permission for the agents to search his room. Agents arrested him and reentered his room to take the shotgun, some ammunition, the baseball cap, and other clothing. The Cavalier was taken to Albuquerque, and three expended .410 shotgun shell casings were found in it the next day.

Defendant was indicted on one count of assault with a dangerous weapon, 18 U.S.C. §§ 1153, 113(a)(3); one count of assault resulting in serious bodily injury, *id.* §§ 1153, 113(a)(6); two counts of use of a firearm in relation to a crime of violence, *id.* §§ 924(c)(1)(A); and one count of first-degree murder, *id.* §§ 1153, 1111. The United States District Court for the District of New Mexico denied his motions to suppress his confession and the evidence taken from his bedroom and the Cavalier. A jury found him guilty on all counts, except that he was convicted of second-degree murder rather than first-degree murder. He appeals the denial of his motions to suppress.

## II.    DISCUSSION

"In reviewing the denial of a motion to suppress, this court views the evidence in the light most favorable to the government and upholds the district court's factual findings unless clearly erroneous." *United States v. Danhauer*, 229 F.3d 1002, 1005 (10th Cir. 2000). The sufficiency of a search warrant and the ultimate determination that a search was reasonable are questions of law that we review de novo. *See id.*; *United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004).

6

We first address whether the search warrant for the green Chevrolet Cavalier was supported by probable cause and then turn to the sufficiency of Mr. Martinez's consent to a search of the house. Because we uphold the validity of the warrant and the reasonableness of the officers' search, we need not reach Defendant's arguments that the good-faith exception does not apply and that evidence uncovered from the searches must be suppressed as fruit of the poisonous tree.

## A. Search Warrant for Vehicle

Defendant challenges the warrant to search the Cavalier on the ground that its supporting affidavit "lacked a substantial basis for probable cause." Aplt. Br. at 32. "A search warrant must be supported by probable cause, requiring more than mere suspicion but less evidence than is necessary to convict." *Danhauer*, 229 F.3d at 1005 (internal quotation marks omitted). "Probable cause exists when the facts presented in the affidavit would warrant a [person] of reasonable caution to believe that evidence of a crime will be found at the place to be searched." *Poolaw v. Marcantel*, 565 F.3d 721, 729 (10th Cir. 2009) (internal quotation marks omitted). "We review the district court's ruling on the sufficiency of the warrant de novo, but we pay great deference to the probable cause determination made by the judge who issued the warrant." *Id.* at 728.

The affidavit offered ample reason to believe that a search of the Cavalier would uncover evidence of Mr. Friday's murder. The last place that Mr. Madrid saw Mr. Friday alive was in the car, less than 16 hours before Mr. Friday's body was discovered the next day. Mr. Friday had spent several hours with the men in the car, they had been drinking

alcohol late into the night, and were likely all intoxicated. The body was found about two miles from where Mr. Madrid had left the vehicle, and the bottle of vodka found with the body was nearly full. Mr. Friday's autopsy revealed that he had been shot at close range with a shotgun. There was a "long 'rifle type' gun" in the car, R., Vol. I at 79, and Defendant had been stopped with a shotgun in his car a few months earlier. The identity of the car was not in doubt because its license-plate number had been recorded by casino police. The natural inference is that the men in the Cavalier used the shotgun in their car to kill Mr. Friday after spending hours drinking with him, and then drove the body to the arroyo where it was found.

Defendant's arguments against probable cause—that too much time elapsed between when Mr. Madrid last saw Mr. Friday and the discovery of his body; that there was not good reason to think that the gun Mr. Madrid saw in the car was the murder weapon; that the Cavalier might not have been the vehicle at the drive-in; and that the affidavit never said that Defendant was a suspect, that Mr. Friday had been harmed in the car, or that there was any evidence of hostility between Defendant and Mr. Friday—are not persuasive. The Fourth Amendment does not require the abandonment of common sense. The officers would have been derelict in their duties had they not sought to search the Cavalier. The search warrant was lawful.

B.      Stepfather's Consent to Search the Residence

Defendant challenges the agents' first search of his bedroom on the ground that his stepfather did not have authority to consent to it. Consent is an exception to the Fourth

Amendment's warrant requirement for a search of a residence. *See Kimoana*, 383 F.3d at 1221. An officer executing a search can rely on a third party's consent if that party has actual or apparent authority. *See id.* Actual authority can be established on two independent grounds: "(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." *Id.* (internal quotation marks omitted). The doctrine of apparent authority holds that a search based on consent is reasonable under the Fourth Amendment even when the officer relies on facts that turn out to be wrong or incomplete so long as the officer's belief at the time of the search was reasonable. "[D]etermination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (ellipses and internal quotation marks omitted).

Under Tenth Circuit precedent, when a child lives with a parent, the parent-child relationship establishes a presumption that the parent has control for most purposes over the property and therefore actual authority to consent to a search of the entire home. *See United States v. Rith*, 164 F.3d 1323, 1330 (10th Cir. 1999) ("Relationships which give rise to a presumption of control of property include parent-child relationships and husband-wife relationships."). Determining whether there is "control for most purposes of property is a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party." *Id.* In *Rith* we held that the defendant's

9

parents had actual authority to consent to a search of their adult son's bedroom for firearms. *See id.* at 1331. Although we recognized that there were no factual findings to satisfy the mutual-use test for actual authority—such as a finding that the defendant's parents had joint access to their son's bedroom—the control-for-most-purposes test was satisfied because the government showed that the defendant lived with his parents, thereby creating "a presumption of control for most purposes by [defendant's parents] over the entire home." *Id.* And there was no evidence to rebut the presumption—"no lock on [Defendant's] bedroom door; no agreement with [Defendant's] parents that they not enter his room without his consent; no payment of rent." *Id.*; *see United States v. Ladell*, 127 F.3d 622, 624 (7th Cir. 1997) (mother had apparent authority to consent to a search of her son's bedroom, in part because "third-party consent is . . . easier to sustain if the relationship between the parties—parent to child here, spouse to spouse in other cases—is especially close"); *United States v. Peterson*, 524 F.2d 167, 179–81 (4th Cir. 1975) (mother had authority to consent to a search of her entire house, including the bedroom where her son stayed). *But see United States v. Whitfield*, 939 F.2d 1071, 1075 (D.C. Cir. 1991) (applying a legal test rejected by the Tenth Circuit, *see Rith*, 164 F.3d at 1329, to conclude that agents could not reasonably believe that mother had authority to consent to a search of her adult son's bedroom without evidence that she had mutual use of the room).

The government acknowledges that there is enough evidence to rebut the presumption of actual authority in this case: Mr. Martinez testified at the suppression

hearing that he usually did not enter Defendant's room and that there was a lock on the door to the room. But it asserts that there was apparent authority because the agents who searched the house did not know either of those facts and were entitled to rely on the presumption of control established by Mr. Martinez's statement that he was Defendant's stepfather.

Defendant points out that the government did not make an apparent-authority argument to the district court. But "we are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law . . . ." *United States v. Nicholson*, 721 F.3d 1236, 1246 (10th Cir. 2013) (brackets and internal quotation marks omitted). The district court relied on apparent authority for its own ruling and appropriately developed the necessary factual record for review. The government defends that ruling on appeal and Defendant provides no reason why it would be unfair for this court to address the issue.

On the merits of the claim of apparent authority, Defendant argues that the stepparent-stepchild relationship should not trigger the same presumption of authority as the parent-child relationship because it "is inherently ambiguous, especially as it pertains to expectations of privacy in a residence and when the stepson is an adult." Aplt. Reply Br. at 20. He cites for support *United States v. Acosta*, 807 F. Supp. 2d 1154, 1211 (N.D. Ga. 2011), which adopted a magistrate judge's recommendation that a stepdaughter did not have authority to consent to a search of her stepfather's locked office or locked bedroom and safe. But that decision did not turn on any distinction between a parent and

11

stepparent. It assumed that the stepdaughter was entitled to the normal presumptions of a parent-child relationship. And it acknowledged that "typically, all family members have common authority over all of the rooms in the family residence." *Id.* (brackets and internal quotation marks omitted). The court concluded only that any presumption of authority had been rebutted because the stepdaughter was the child rather than the parent; the office, bedroom, and safe were all locked; and there was an agreement not to access the rooms. *See id.*

In our view, the presumption regarding a parent also applies to a stepparent. An owner of a house is presumed to have control for most purposes of the entire house, including the bedroom of a stepchild permitted to live there. Stepparents are part of the family, and when they live with stepchildren they will necessarily share the intimacies of family life. The relationship between a child and stepparent may be less loving than between a child and natural parent, but it may also be more loving. We are not about to insist on an examination of the extent of ties of affection between an adult and a child or stepchild in assessing the authority of a consent.

Despite the presumption, Defendant contends that the agents should have made further inquiry of his stepfather, asking about his precise relationship with Defendant and whether Defendant had a bedroom at the house. He relies on our statement that "where an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent." *United States v. Cos*, 498 F.3d 1115, 1128 (10th Cir. 2007) (internal quotation marks omitted). "'[S]ometimes the facts known

12

by the police cry out for further inquiry, and when this is the case it is not reasonable for the police to proceed on the theory that "ignorance is bliss."'" *Id.* at 1129 (quoting 4 Wayne R. LaFave, *Search & Seizure* § 8.3(g) at 180 (4th ed. 2004)).

But the ambiguity referred to in *Cos* arises only when the facts known to the officers do not already imply authority. In *Cos* we held that a woman did not have apparent authority to consent to a search of a home when officers knew only that she answered the door in the afternoon and that she had children with her. *See id.* at 1129. We explained that the officers had no reason to think she had mutual use of the house or control over it for most purposes; she could have been "a repairman, a visitor, or a neighbor watering the plants or feeding the pets." *Id.* at 1130. Therefore, the officers who knocked on the door were "confronted with an ambiguous situation." *Id.* at 1131 (internal quotation marks omitted). We distinguished four cases in which the authority of the consenter was apparent only because officers had acquired more information (implicitly stating that further inquiry after that point was unnecessary). *See id.* at 1130. In *United States v. Goins*, 437 F.3d 644, 649 (7th Cir. 2006), officers reasonably believed that the defendant's girlfriend had authority after they learned that she had a key to the apartment, sometimes lived there, cleaned and did household chores, and kept some possessions there. In *United States v. Meada*, 408 F.3d 14, 21 (1st Cir. 2005), officers were told by the defendant's girlfriend that she kept possessions in the apartment and could enter in defendant's absence. In *United States v. Hudson*, 405 F.3d 425, 442–43 (6th Cir. 2005), officers reasonably believed that the third party was romantically

13

involved with the defendant, lived in the same home, and had a key.  And, in *Harajli v. Huron Township,* 365 F.3d 501, 506 (6th Cir. 2004), the third party had a garage-door opener and had recently lived in the house.  In these cases, officers did not need to make further inquiries about such matters as the precise nature of the romantic relationship between the consenter and the defendant.

Once officers reasonably believe that an individual has the authority to consent, we do not require them to keep investigating merely because one can imagine some way that additional facts might alter their analysis.  The test for apparent authority, after all, is whether "the facts available to the officer at the moment warrant a [person] of reasonable caution to believe that the consenting party had authority over the premises." *Kimoana*, 383 F.3d at 1222 (brackets, ellipsis, and internal quotation marks omitted).  For example, in *Kimoana* we said that authority would be ambiguous if officers had known only that the party consenting to the search of a motel room had said that the room was not his. *See id.* at 1222–23.  But any ambiguity was removed because the officer knew that the consenter had a key to the room and had stayed there, thereby showing his mutual use of the room.  *See id.* at 1223.  Similarly, *United States v. Gutierrez-Hermosillo*, 142 F.3d 1225 (10th Cir. 1998), held that it was reasonable for officers to rely on a 14-year-old girl's consent to search a motel room she shared with her father when they knew that she was traveling with her father and that they shared a room.  *See id.* at 1229, 1231.

We hold that when officers know facts creating a presumption of authority to consent, the officers need not make further inquiry into authority unless they learn

additional facts (such as that the stepson pays rent) that may undermine the presumption. Here, if the agents had learned that Defendant kept a lock on his door and that Mr. Martinez did not enter his bedroom, they may no longer have been justified in relying on Mr. Martinez's consent to search the bedroom. *See Rith*, 164 F.3d at 1330–31. But the district court found that they did not know those facts. Given the findings of the district court, its ruling on apparent authority was sound.

## III. CONCLUSION

We AFFIRM the district court's denial of Defendant's motions to suppress evidence.