**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 17, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

KYLEAR WILLIAMS,

     Defendant - Appellant.

No. 24-1510

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:24-CR-00112-PAB-1)**
_____

Gail K. Johnson of Johnson & Klein, PLLC, Boulder, Colorado, for Defendant-Appellant.

J. Bishop Grewell, Assistant United States Attorney (Peter McNeilly, United States Attorney, with him on the briefs), Denver, Colorado, for Plaintiff-Appellee.
_____

Before **PHILLIPS**, **KELLY**, and **MORITZ**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

We must decide whether the Fourth Amendment permitted a protective sweep of a car after the driver was arrested and handcuffed. Everyone agrees that the police developed reasonable suspicion that the driver was armed and

dangerous. But with the arrest, any safety risks that the driver posed to the officers ended. Still, the police conducted a protective sweep of the driver's area rather than let the passenger-owner leave it legally parked or drive it away. Within seconds of beginning the sweep, officers recovered from under the driver's seat a loaded handgun and a magazine containing ammunition.

A federal grand jury indicted the driver for possessing ammunition after a felony conviction. In response to the driver's motion to suppress the firearm and ammunition, the government argued that the protective sweep was reasonable under the Fourth Amendment. It contended that objectively reasonable officers would have suspected that the passenger, too, was armed and dangerous. To support this view, the government projected the driver's alarming criminal history and gang ties to the passenger. It argued that prudent officers would reasonably suspect a passenger-girlfriend of a gang-associated boyfriend as a threat to access a hidden weapon from inside the car and to use it in a quixotic attempt to free him from four alert, armed officers.

The district court approved the protective sweep and denied the suppression motion. Agreeing with the government, the court ruled that the officers had reasonable suspicion that the girlfriend-passenger was armed and dangerous. It relied solely on her "romantic relationship" with the boyfriend-driver. But this amounts to a criminality-by-association test, when the governing test instead requires that we consider the totality of circumstances. The circumstances of *this* passenger include these: she produced a valid

driver's license, current registration, and proof of insurance for her car; she was polite, calm, and cooperative throughout the stop; and she committed no crime and was not suspected of being involved in any. We conclude that the protective search was unreasonable under the Fourth Amendment. We reverse.

## BACKGROUND

### I.    Factual Background

At 8:24 p.m. on January 20, 2024, Kylear Williams and his girlfriend, Ajanaya Richardson, were riding in her Chevy Impala down Colfax Avenue in Denver. Ms. Richardson had dropped off her daughter with her sister for the night, and she and Williams were within a block of arriving back at his house, which he shared with his father. Two Denver police officers on patrol (members of the Special Operations Response Team)—Corporal Zachary Moldenhauer and Officer Emmet Hurd—noticed that the Impala was missing its front license plate. They kept their gaze on the Impala and saw the driver fail to use his turn signal. With flashing overhead lights, they signaled for the Impala to pull over. The driver, Williams, immediately did so. The officers watched the Impala's two occupants for furtive movements and saw none.

After Williams pulled over, but before the officers approached the Impala on foot, Williams telephoned his father at their house across the street. As seen on the video, his father and two others came outside and watched the stop from the driveway.

3

Williams's house is on a residential street that lies within the East Colfax Corridor of northeast Denver. Broadly speaking, the police consider this corridor a high-crime area. The two officers had each worked in this area for years. According to them, some of this corridor amounts to an "open-air drug market" where "[t]he sale and distribution of narcotics is very prevalent." R. at 69. The officers describe it as having "a lot of violent crimes, shootings, stabbings, homicides, and a lot of weapons-related offenses." *Id.* Carjackings and gang activity abound.

Before the cars rolled to a stop, Cpl. Moldenhauer called in the Impala's license plate. He learned that the car was registered to a woman named Ajanaya Richardson. About twenty seconds after the cars stopped, Cpl. Moldenhauer walked to the driver's window, and Officer Hurd walked to the passenger window.

### A.    Williams's Car Window

By the time Cpl. Moldenhauer reached the driver's door, Williams had rolled down his window and placed his hands on the steering wheel. Cpl. Moldenhauer asked, "What's going on, man?" Williams's response is inaudible on the video recording, but Cpl. Moldenhauer replied, "Good, how are you?" Cpl. Moldenhauer asked, "Hey, you got your license, registration, insurance?" Williams responded that "it's her car." Cpl. Moldenhauer then asked for Williams's identification.

4

As Williams reached inside his sweatpants pocket for his wallet, Cpl. Moldenhauer asked, "What you guys up to tonight?" Williams removed his Colorado identification from his wallet and handed it to Cpl. Moldenhauer. Cpl. Moldenhauer said, "You said it's her car?" Williams said, "Yeah." After examining the ID, Cpl. Moldenhauer asked, "Kylear, where you stay at, man?" Williams responded, "Uh, right here," gesturing toward the other side of the street.

Cpl. Moldenhauer noticed that the ID listed Williams's address as that of a Denver detention facility. Cpl. Moldenhauer asked, "Get your ID when you were locked up, man?" Williams responded, "Yeah." Cpl. Moldenhauer asked when Williams had been released, and Williams said about three months ago. Cpl. Moldenhauer asked, "What were you in for?" and Williams said, "Colorado Organized Crime Act." Cpl. Moldenhauer asked, "Who do you roll with?" Williams said, "Park Hill." Cpl. Moldenhauer clarified, "Park Hill Bloods?" and Williams said, "Yeah." Then Cpl. Moldenhauer asked, "When'd you get wrapped up in that?" Williams said, "Like 2018," adding that he was in prison "almost six years."

Cpl. Moldenhauer remarked, "You've been doing good," and Williams perked up and said, "Yeah I just seen my PO the other day." Cpl. Moldenhauer shined the flashlight on Williams's arm tattoo and asked whether it was a known Park Hill tattoo. Williams said, "Yeah."

Staying on the gang subject, Cpl. Moldenhauer asked, "You seen anybody since you been out from Park Hill?" Williams said, "Nah, I've just been trying to just stay out the way. I've just been working and everything." Cpl. Moldenhauer asked, "You done with that lifestyle or are you still rolling with it? Never-get-out type thing?" Williams said, "Yeah, kinda but, you know, I can still like be me and love where I'm from but from a distance." Williams declared gang life too "stressful."

At that moment, Ms. Richardson found the registration and proof of insurance and handed the two documents to Officer Hurd. After Officer Hurd signaled to Cpl. Moldenhauer that he had obtained them, Cpl. Moldenhauer said, "Be right back with you, man." The two officers returned to the patrol car. They left Williams and Ms. Richardson sitting in the Impala.

## B.    Ms. Richardson's Car Window

Meanwhile, when Officer Hurd arrived at Ms. Richardson's car window, she had her valid driver's license in hand. She was sorting through papers in the glove box and center console for the car's registration and proof of insurance. Having difficulty finding them, Ms. Richardson apologized, and the officer responded, "You're fine." As Officer Hurd waited the two minutes or so it took her to locate them, he shined his flashlight through the windshield and passenger window into the car's interior—including into the opened glove box and toward the center console, as well as into the back-seat area.

6

As Ms. Richardson continued sorting through the loose papers, Officer Hurd asked her, "Where you guys coming from this evening?" She answered that she had just dropped her daughter off for the night. After finding the requested documents and handing them to Officer Hurd, Ms. Richardson asked, "How are you?" and Officer Hurd responded, "I'm good how are you?" Ms. Richardson replied, "Doing well, thank you." And Officer Hurd responded, "That's good."

Officer Hurd testified that at some point Ms. Richardson told him that she was dating Williams.[1] The officers later testified that Ms. Richardson was cooperative, polite, and pleasant, willing to "engage[] in small talk." They also testified that Williams cooperated throughout the stop.

### C.    Back in the Patrol Car

When back in the patrol car, Officer Hurd checked for active warrants and criminal history for Williams and Ms. Richardson. He learned that Williams had no valid driver's license, had two active municipal-court arrest warrants, had a history of charges involving violence and weapons, and had ties to the Crenshaw Mafia Bloods. In contrast, the officers learned that Ms. Richardson had a valid driver's license and no arrest warrants.

---

[1] After listening to the video recordings multiple times, we have been unable to hear Ms. Richardson mention that she and Williams were dating. Because the district court's order is built on that premise, it's an important fact. But Williams does not contest that this happened, so we accept it for this appeal.

### D.    The Arrest, Detention, and Protective Sweep

After learning about Williams's history, the officers called for backup. About two minutes later, Officers Danielson and Gergits arrived. Cpl. Moldenhauer and Officer Hurd went to the driver's side window and had Williams exit the car. They immediately handcuffed and arrested him on the municipal warrants. They then moved him about thirty feet away near the patrol car and patted him down.

After Williams was handcuffed and led away from the Impala, Officer Danielson spoke to Ms. Richardson from the passenger door. He told her that she was "not in any trouble or nothing" and asked her to "hop out for me." She said "yes" and did so.

Ms. Richardson was wearing a mostly snug black sweatshirt and tight jeans. Officer Williamson had Ms. Richardson place her hands on top of the car, and he patted her down for thirteen seconds. Then he directed her to the back of the Impala and faced her away from it. She remained fully compliant and silent. The officers had already positioned Williams facing the patrol car with his back to Ms. Richardson. Ms. Richardson did not communicate with Williams in any fashion after the officers removed him from the Impala. In the videos, both Ms. Richardson and Williams are silent, docile, and compliant.

Cpl. Moldenhauer didn't immediately take Williams to the police station. Instead, he stayed to conduct a "protective sweep" of Ms. Richardson's car. Within seconds, he saw a handgun and magazine lying about halfway under the

driver's seat. The handgun was loaded, lacked a serial number (a "Ghost gun"), and bore a "Park Hill Center" stamp or sticker. The magazine held ammunition.

Cpl. Moldenhauer immediately signaled for Officer Gergits to handcuff Ms. Richardson. Cpl. Moldenhauer testified that the handcuffing was to eliminate any chance Ms. Richardson might try to access the handgun or the car while the officers fully searched it and processed Williams.

As the officers turned Ms. Richardson toward the Impala and began handcuffing her, she calmly asked, "May I ask why I'm being detained?" Cpl. Moldenhauer replied, "Yeah, I'll tell you here in a second, ok?" He then faced Ms. Richardson away from her car again, where she remained handcuffed and silent for several minutes until the video ends. By the time Ms. Richardson was handcuffed, Williams was on his way to the back seat of the patrol car. The four officers were either searching the Impala or lingering near it. One kept close watch on Ms. Richardson the whole time.

During the ensuing full search of the car, Cpl. Moldenhauer told another officer, "He said he lives right there." An officer then spoke to the people standing across the street, saying, "How's it going guys?" Someone responded, "all right." The officer asked, "Are you related to Mr. Williams?" After they responded yes, the officer replied, "All right, I'll be right over to talk to you, ok?" Soon after, Officer Hurd spent about a minute talking to the Williams family members in their driveway.

About then, Officer Gergits moved Ms. Richardson to the front of the patrol car, this time facing the Impala. Cpl. Moldenhauer opened the Impala's trunk and began searching its contents. It was jam-packed with a child's car seat, blankets, and clothing.[2]

After the protective sweep and full search, an officer told Ms. Richardson that she would be able to take control of her car. But Officer Danielson had already called for a tow truck. So after Cpl. Moldenhauer and Officer Hurd left with Williams, Officers Danielson and Gergits waited for the tow truck. Ms. Richardson joined Williams' family members across the street. Ms. Richardson incurred a $3,000 lot-storage bill and spent a "long month" without her car. She was never ticketed for a license-plate violation if one even occurred.

## II.    Procedural History

A federal grand jury in Colorado charged Williams with being a felon in possession of ammunition. *See generally* 18 U.S.C. § 922(g)(1). Williams moved to suppress evidence of the firearm and ammunition. He argued that the officers had lacked reasonable suspicion that Ms. Richardson was armed and dangerous, as needed to justify a protective search of the car. After a hearing, the district court denied the suppression motion.

---

[2] Officer Hurd testified that he read Ms. Richardson a *Miranda* warning, but the video cuts off before that occurred. After waiving her rights, she told him that she had known Williams for about eight years and had not ever seen or heard about the handgun. After the officers found his firearm, Williams told them that Ms. Richardson had not known of the firearm.

Williams pleaded guilty but reserved his right to appeal the court's order denying suppression. The court sentenced him to sixty-three months' imprisonment followed by three years of supervised release. Williams appealed.

## STANDARD OF REVIEW

When reviewing a district court's denial of a motion to suppress, we examine the totality of the circumstances. *United States v. Canada*, 76 F.4th 1304, 1307 (10th Cir. 2023). We view all facts in the light most favorable to the government and accept the district court's findings of fact unless they are clearly erroneous. *United States v. Pena*, 115 F.4th 1254, 1258–59 (10th Cir. 2024).

We review de novo the question of reasonableness under the Fourth Amendment. *United States v. Johnson*, 43 F.4th 1100, 1107 (10th Cir. 2022). In doing so, we "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *Canada*, 76 F.4th at 1307 (citation omitted). The government bears the burden of proving reasonable suspicion, which is not an onerous one. *United States v. Frazier*, 30 F.4th 1165, 1174 (10th Cir. 2022).

## DISCUSSION

This appeal raises a question about the reasonableness of detaining a passenger away from her car while the police conduct a protective sweep of the driver's area. Here, the officers could conduct a protective sweep of Ms. Richardson's car only if they had reasonable suspicion that she was armed and

11

dangerous. The test is an objective one. The district court ruled that Ms. Richardson's dating relationship with a gang-associated man like Williams supplied the required reasonable suspicion. After considering the totality of circumstances, we disagree.

## I.    The Fourth Amendment

The Fourth Amendment prohibits unreasonable searches of "persons, houses, papers, and effects." U.S. Const. amend. IV. A "vehicle is an 'effect' protected by the Fourth Amendment." *Canada*, 76 F.4th at 1307 (quoting *Byrd v. United States*, 584 U.S. 395, 403 (2018)).

Courts recognize that the government has a "legitimate and weighty" interest in officer safety. *See Rodriguez v. United States*, 575 U.S. 348, 356 (2015) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (1983)). Because traffic stops are inherently dangerous, police can order a driver and passengers out of an automobile during a stop. *See Maryland v. Wilson*, 519 U.S. 408, 415 (1997). At the same time, courts do not ignore "the countervailing interest that all individuals share in having their constitutional rights fully protected." *Arizona v. Gant*, 556 U.S. 332, 349 (2009).

Generally, warrantless searches are unreasonable, but this rule has several exceptions. One such exception, and the one at issue here, allows officers to perform protective sweeps of "areas in which a weapon may be placed or hidden" if the police reasonably suspect that "a suspect poses a danger and may gain immediate access to a weapon." *Canada*, 76 F.4th at 1307.

In that instance, the police can sweep areas of the automobile from which the returning occupant could immediately access a weapon. *See Michigan v. Long*, 463 U.S. 1032, 1052 (1983) (comparing a protective sweep in this circumstance to a *Terry* stop because "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside").

## II.    Analysis

The district court ruled that the protective sweep—occurring after Williams had been handcuffed, arrested, and moved away to the patrol car— complied with the Fourth Amendment. It announced what we perceive to be a per se rule that "when you're taking the romantic partner of someone away, there is a potential for violence." R. at 144. It expanded on this statement as follows:

> [T]he Court finds that a reasonable officer could believe that the fact that Mr. Williams is being arrested and taken away from her, that could motivate a romantic partner and probably particularly a romantic partner of a gang member to believe that she needed to somehow intervene or defend her romantic partner by accessing a weapon that was located in the car.

R. at 150. Later, the court summarized its thoughts this way: "the Court does not believe that the officers had to conclude through some type of observations outside her romantic relationship to Mr. Williams that she was in and of herself a dangerous person." R. at 154.

Even if we credited this rationale as viable, which we don't, we would notice that the government offered scant evidence about the degree of the "romantic relationship." The officers knew that the two were dating and that Williams had been released just three months earlier from a six-year prison term.

The government must show that "the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of the weapons." *Long*, 463 U.S. at 1049 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)); *see also United States v. Raban*, 162 F.4th 1223, 1231 (10th Cir. 2025) ("Protective sweeps 'exist for officer safety; we do not require officers to take unnecessary risks.'" (quoting *Canada*, 76 F.4th at 1309)).

For the "armed" piece, we agree that the officers could reasonably suspect that Ms. Richardson "may gain immediate access to a weapon" that Williams might have hidden under the driver's seat. *See Canada*, 76 F.4th at 1307. Crediting the importance of officer safety, we agree that the officers could reasonably infer that Ms. Richardson would have known of any hidden firearm.

For the "and dangerous" condition, we note that the government did not even try to show Ms. Richardson's dangerousness apart from relying on her dating relationship with Williams. But a dating relationship is just one

14

circumstance among a totality of them. *See United States v. McGregor*, 158 F.4th 1082, 1091–92 (10th Cir. 2025) (explaining that we analyze reasonable suspicion for a protective sweep under "the totality of the circumstances"). Among other things, the officers also knew (1) that Ms. Richardson (and Williams) had been polite and cooperative throughout the stop, (2) that she was not under the influence of any intoxicants, (3) that she was not acting angry or upset, (4) that she voluntarily disclosed the dating relationship, (5) that she was a mother who had just dropped off her daughter at her sister's for the night, (6) that Williams had been released from prison three months earlier after being incarcerated for six years, (7) that she and Williams had just arrived back at his house, and (8) that she and Williams did not communicate after the officers removed Williams from the Impala. Nothing about Ms. Richardson during the stop suggested a person ready to die in a shootout with four officers.

We reject a rule that a woman with a dating partner like Williams is per se reasonably suspicious for being armed and dangerous. This rule would not harmonize with *Poolaw v. Marcantel*, 565 F.3d 721 (10th Cir. 2009). There, we held that "a familial relationship is insufficiently particularized to justify invading an individual's reasonable expectation of privacy." *Id.* at 725. We applied this rule to the defendant's sister-in-law and parents-in-law, concluding that "combined with the meager additional facts known to [the officers], [those family relationships] were insufficient to support a finding of either probable cause to search the property or reasonable suspicion to detain [the sister-in-law

15

at a traffic stop]." *Id.* And those family relationships were closer than the short dating relationship known to the officers here.

In addition, we find persuasive *United States v. Johnson*, 163 F.4th 933 (5th Cir. 2026). There, officers waited for Johnson to leave his house to arrest him on a warrant for violating his federal supervised-release conditions arising from drug convictions. *Id.* at 936. Johnson was a Bloods gang member and was the primary suspect in an ongoing homicide investigation. *Id.* at 935–36. He backed out of his driveway into the street, and the officers stopped the car. Johnson exited the car. His passenger and live-in girlfriend, Beatrice Simmons, stayed inside it. *Id.* at 936.

The officers had information that Simmons had once told officers that "she was a felon and either on probation or on parole."[3] *Id.* at 936. The officers removed Simmons from the car and stood her in the driveway unhandcuffed. *Id.* Johnson told Simmons to return the car to the driveway and advised the officers that it was her car. *Id.* The officers ran a protective sweep of the driver's area. *Id.* In the car's center console, the officers found a loaded handgun with a full magazine. *Id.* The officers handcuffed Simmons, who told them that she had not known of the handgun. *Id.*

---

[3] The court later noted that the officers "had no more reason to suspect Simmons previously committed tax fraud or perjury than some serious violent offense" and that the officer was "unaware of the timing of Simmons's conviction." *Johnson*, 163 F.4th at 940 n.4.

16

As here, the boyfriend in *Johnson* was charged with a federal felon-in-possession crime and moved to suppress the firearm and ammunition from evidence. *Id.* The government argued on officer-safety grounds that the protective sweep was reasonable under the Fourth Amendment. *Id.* at 937.

Despite the officers' information that Simmons might be a felon, and despite her "romantic" and live-in relationship with Johnson, the Fifth Circuit held "that [Simmons's] presence did not justify the warrantless search of Johnson's vehicle." *Id.* at 935. It did so "[b]ecause the officers observed nothing to suggest that Simmons was potentially dangerous." *Id.* Though acknowledging "that Simmons's criminal record and close relationship with Johnson were properly considered . . . in determining whether Simmons might have been dangerous," the court found that information insufficient "without some fact contemporaneous to or arising out of Johnson's arrest that suggests Simmons was potentially dangerous." *Id.* at 943. And without such a showing, the court determined that "the totality of these circumstances could not have caused [the officer] to reasonably fear for his safety." *Id.*

We agree and note that *Johnson*'s facts presented a stronger case for a protective sweep than do the facts in our appeal.

Ruling before *Johnson* was decided, the district court in the present case commented that the "case law is not particularly well developed" for the issue

17

raised in the motion to suppress.[4] R. at 151. The district court noted the unique question of reasonable suspicion of a passenger not suspected of criminal activity and asked the parties for any helpful cases. The government argued that *United States v. Dennison*, 410 F.3d 1203 (10th Cir. 2005), "really governs the analysis of a passenger," R. at 126, and added that it "d[idn't] have a case to cite you to outside of *Dennison*,"[5] R. at 132.

The district court relied primarily on *Dennison* to support its ruling, and the government treats it as its centerpiece on appeal. In this regard, the government contends that the facts of Williams's case "mirror those in *Dennison*," Resp. Br. at 8, and it describes the underlying factual situations as "nearly identical,"[6] *id.* at 12.

---

[4] The district court—and the government—relied on this statement from Justice Scalia in *Gant*: "In the no-arrest case, the possibility of access to weapons in the vehicle always exists, since the driver or passenger will be allowed to return to the vehicle when the interrogation is completed." 556 U.S. at 352 (Scalia, J., concurring). We agree that *Long*'s protective-sweep exception can apply to passengers, too—but only passengers reasonably suspected of being armed and dangerous. We don't understand Justice Scalia's statement to say otherwise.

[5] Unlike here, the government in *Dennison* never argued officer safety based on a reasonable suspicion that Dennison was a danger to immediately access weapons and use them to try to free his passenger, Keith Allen, from police custody.

[6] In the district court, the government acknowledged that the relationship between the two men in *Dennison* involved "perhaps a little more nefarious nature" than the one between Williams and Ms. Richardson. R. at 131. But the government argued that the "inference" that the two men were "engaged in perhaps some additional criminal activity . . . [as] suspected in *Dennison*" was

(*footnote continued*)

We conclude that *Dennison* does not justify the district court's ruling. In *Dennison*, an officer on patrol was at an "apartment complex that had a high incidence of nighttime car theft." 410 F.3d at 1205. At about 3 a.m., he saw a gold Ford truck with a "topper" shell parked with its engine and lights turned off. *Id.* The officer "pulled up alongside the truck and asked what the two men [in the truck] were doing." *Id.* The men said that they had lost the keys to a Chevy pickup in a separate parking lot and were awaiting a tow truck. *Id.* The parking lot was "an extensive distance away." *Id.*

The officer left and circled the apartment complex for about twenty or thirty seconds but returned to the truck after feeling that "something didn't seem right." *Id.* at 1206. In that short time, the driver of the Ford truck had moved it closer to the parking lot supposedly containing the Chevy and now had its engine running and lights on. *Id.* The officer got out of his patrol car to "check and make sure [the Chevy was] their truck." *Id.* at 1206.

During this second encounter with the patrol officer, the passenger, Keith Allen, mentioned that he had been in a "domestic" and was "wanting to get the Chevy truck before his girlfriend came and damaged it." *Id.* This jogged the officer's memory of "a recent police bulletin to watch for a gold station wagon

---

not necessary for reasonable suspicion that a passenger like Ms. Richardson was armed and dangerous. R. at 128. Instead, the government argued that *Dennison* supported such reasonable suspicion when "there is that common interest that when individuals are traveling, they discuss a [sic] close quarters, if you will, within the passenger compartment of the vehicle." R. at 126. But as we will explain, we reject that reading of *Dennison*.

in the vicinity of the apartment complex because the police wanted a driver or passenger for a domestic violence incident." *Id.* Anticipating arresting Allen, the officer obtained each man's identification.

After running that information through the system, the officer learned that Allen had four outstanding arrest warrants, including a felony arrest warrant for a weapons violation, and that the driver, Dennison, had none. *Id.* After backup arrived, the officers arrested Allen and placed him in the patrol car. *Id.* Before the protective sweep, they had Dennison exit the truck, patted him down, and handcuffed him at the back of the truck. *Id.* He refused to give consent to search his truck.[7] *Id.*

During the search, a backup officer found "a loaded shotgun on the back seat under a blanket." *Id.* The initial officer then shined his flashlight into the topper shell and "saw the vented barrel of a machine gun partially exposed under a blanket inside the cargo bed." *Id.* Soon after, the officers found "a loaded handgun and drug paraphernalia in the front and back seats." *Id.*

After arresting Dennison on firearms charges, the police impounded and inventoried the truck. *Id.* Police later found a second machine gun and several other firearms. *Id.* at 1207.

After pleading guilty to firearms charges, Dennison appealed the legality of the protective sweep. *Id.* We examined whether the officer-safety exception

---

[7] In our case, the officers never asked for Ms. Richardson's consent to search the Impala.

justified "a protective sweep of Mr. Dennison's passenger compartment." *Id.* at 1210. We began by noting that "[o]fficers can conduct a protective search of a vehicle's passenger compartment for weapons during an investigative detention when officers have a reasonable belief that a suspect poses a danger." *Id.* at 1210 (citing *Long*, 463 U.S. at 1036).

We affirmed after concluding that "the officers had a reasonable suspicion that Mr. Dennison was dangerous and able to gain immediate control of weapons." *Id.* at 1214. From that, we ruled that "[t]his reasonable belief of Mr. Dennison's threat to officer safety validated a protective sweep of the truck's cab." *Id.* Otherwise stated, "in light of the totality of circumstances," we ruled that the "officers did have reasonable and articulable suspicion of Mr. Dennison's threat to officer safety to justify the protective sweep of his truck's passenger compartment." *Id.* at 1212.

In so ruling, we examined what the officers knew about the connection between him and Allen. *Id.* at 1213. We declared it important that the officer "found both men in Mr. Dennison's truck in an apartment complex lot at 3:00 a.m., allegedly waiting for a tow truck." *Id.* at 1212–13. We approved the protective sweep after concluding that officers "could reasonably infer a common purpose or 'enterprise' between the two men and believe that Mr. Dennison knew of Mr. Allen's arrest warrants and would want to conceal evidence of any wrongdoing." *Id.* at 1213.

We also emphasized that "the detention, arrest, and search occurred late at night in a high-crime area, and officers could not clearly tell whether Mr. Dennison had weapons in the vehicle within reach." *Id.* We found it important that "officers here were assisting in the late-night arrest of a potentially dangerous suspect in a high-crime area." *Id.* at 1214.

The facts supporting reasonable suspicion that Dennison was armed and dangerous are much more compelling than Ms. Richardson's dating relationship with Williams. She was legally riding in her car on a public street at 8:23 p.m., not lurking in an apartment-complex parking lot at 3 a.m. She had arrived at her boyfriend's house, located on a residential street[8] lying in the expansive "East Colfax Corridor," not at a specific "apartment complex that had a high incidence of nighttime car theft."[9] *Id.* at 1205. Though the two cases involve some superficial similarities (cooperation, providing valid identification, no threatening behavior), *id.* at 1212, they differ greatly on what matters.[10]

---

[8] Williams's father testified at the suppression hearing that an officer came across the street to explain the reason for the stop. Williams's father recognized the officer as his neighbor from across the street. After explaining the traffic violation, the officer said, "Sorry we had to meet like this, chief," before walking back to the patrol car.

[9] That the "East Colfax Corridor" is a high-crime area doesn't necessarily mean that the Williams's house, the street, or the neighboring businesses are high-crime areas. Yet the officers' testimony wasn't specific about the crime rate at or near Williams's residence.

[10] The district court also mentioned in passing *Wyoming v. Houghton*, 526 U.S. 295, 304–05 (1999), for this proposition: "In addition, a car

(*footnote continued*)

22

The police had reasonable suspicion that Williams was armed and dangerous. If he had been alone and without active warrants, the police could have conducted a protective sweep before letting him return to the car. That would be an easy case under our precedents.

But this appeal is not so easy. Here, what matters is whether the police had reasonable suspicion that *Ms. Richardson* was armed and dangerous. The government's reliance on *Dennison* to satisfy this requirement fails.

The district court considered other cases too. The court deemed *Canada*, 76 F.4th 1304, to be "very relevant authority" for the appropriate test for officer safety preceding a protective sweep. R. at 145. But as the court noted, *Canada* differed in a key respect from the instant case: *Canada* concerned a traffic stop involving only a driver and not a passenger. R. at 145. So nothing in *Canada* sheds light on protective sweeps in Ms. Richardson's circumstance.

The district court also reviewed *United States v. Fager*, 811 F.3d 381 (10th Cir. 2016). But that case concerned a challenged frisk of a motorist in which a firearm was found on his person. *Id.* at 383. In justifying the pat-down, we generally reviewed some cases involving officer safety. Among these were *Dennison*, which we cited for the notion that a "'common purpose or enterprise'

---

passenger . . . will often be engaged in a common enterprise with the driver and have the same interest in concealing the fruits or the evidence of their wrongdoing." But again, this case is far different from ours. In *Houghton*, a trooper noticed a hypodermic syringe in the driver's pocket and methamphetamine in a passenger's purse. *Id.* at 298. Obviously, none of this corresponds to Ms. Richardson's situation.

also bears on the reasonable suspicion analysis." *Id.* at 386. But that general proposition is unhelpful in assessing the present protective sweep. And like *Canada*, *Fager* involved a driver and no passengers. So it provides no help either.

## CONCLUSION

We vacate Williams's conviction and remand for further proceedings.

No. 24-1510, United States v. Kylear Williams

**KELLY,** Circuit Judge, dissenting.

I agree that there was reasonable suspicion to conclude that there was a firearm in the car, that Ms. Richardson would have known of it, and that she would have immediate access to it upon returning to the vehicle.  Ct. Op. at 14.  However, I disagree with the court's conclusion that the officers lacked reasonable suspicion to believe that Ms. Richardson was dangerous and would affirm the district court's decision denying the motion to suppress and the conviction.

The principal justification for a protective sweep is for officer safety.  United States v. Canada, 76 F.4th 1304, 1307 (10th Cir. 2023).  Such concerns are "both legitimate and weighty" due to the risks that come with even run-of-the-mill traffic stops.  Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977).  Therefore, officers may "take steps reasonably necessary to protect their personal safety."  Canada, 76 F.4th at 1307 (citation modified).

We evaluate reasonableness from the perspective of an objectively reasonable officer based on the totality of the circumstances.  United States v. Samilton, 56 F.4th 820, 827 (10th Cir. 2022).  "[O]ur evaluation is guided by common sense and ordinary human experience."  United States v. Fonseca, 744 F.3d 674, 680 (10th Cir. 2014) (quoting United States v. Albert, 579 F.3d 1188, 1193 (10th Cir. 2009)).  And we "defer to all reasonable inferences made by law enforcement officers in light of their knowledge and professional experience[.]"  United States v. Gurule, 935 F.3d 878, 885 (10th Cir. 2019) (quoting United States v. Pettit, 785 F.3d 1374, 1379 (10th Cir. 2015)).  Thus, our

analysis ultimately turns on whether a "reasonably prudent" officer "would be warranted in the belief that his safety . . . was in danger" given the attendant circumstances. Michigan v. Long, 463 U.S. 1032, 1050 (1983) (citation modified).

The court lists several facts to conclude that there was "[n]othing about Ms. Richardson during the stop" to suggest that she was "ready to die in a shootout with four officers." Ct. Op. at 14–15. But we must consider all the attendant circumstances. And there are other facts that weigh in favor of reasonableness.

Here, knowing that they were going to arrest Mr. Williams for outstanding warrants, the officers requested cover officers for officer safety before removing any of the occupants from the vehicle. III R. 16–17. The officers testified that they were going to release Ms. Richardson and allow her to drive the car away, but had concerns about their safety given they reasonably suspected that there was a firearm in the car. Id. at 16–17, 40–41. One officer testified, based on his training and experience, that safety concerns are heightened where, as here, an individual is being taken away from his or her romantic partner because "that individual could access a firearm if one potentially is inside the vehicle and try to harm officers." Id. at 41. Another officer echoed these concerns. Id. at 18. I see no reason not to defer to that reasonable inference here.

Thus, the fact that Ms. Richardson was in a romantic relationship with Mr. Williams and the fact that he "was contemporaneously being arrested" both weigh in favor of a finding of dangerousness. United States v. Johnson, 163 F.4th 933, 944 (5th Cir. 2026) (Haynes, J., dissenting) (emphasis in original); see also Fishbein ex rel. Fishbein v. City of Glenwood Springs, 469 F.3d 957, 962 (10th Cir. 2006) (finding a

2

protective sweep justified where officers arresting a couple at their home reasonably inferred that their teenage child could be inside, armed, and, "having just observed his parents' arrest, could be hostile to the arresting officers" because they knew the couple had teenage children and that firearms had been present in the home).

Other facts support the officers' decision to conduct a protective sweep. The stop took place at night. And the officers testified, based on their knowledge and experience, that the surrounding area was dangerous, noting that it had high frequencies of violent crime, was an "open-air drug market," and had armed gang members operating in it. III R. 8–9; 34–35. Both of those factors also weigh in favor of reasonableness. United States v. Dennison, 410 F.3d 1203, 1213 (10th Cir. 2005).

Therefore, when considering all the facts, and when viewing them in the light most favorable to the government, I believe a reasonably prudent officer would be warranted in fearing for his or her safety. Long, 463 U.S. at 1050; see Johnson, 163 F.4th at 946 (Haynes, J., dissenting).

Our inquiry into reasonableness should avoid "engag[ing] in unrealistic second-guessing of a police officer's decision." Fonseca, 744 F.3d at 681 (citation modified). Unfortunately, that is what the court's opinion does here. Therefore, I respectfully dissent.